James G. **ELLINGBURG**, Petitioner,

v.

A. L. **LOCKHART**, Superintendent of the Cummins Unit, Arkansas Department of Correction, Respondent.

No. PB–73–C–7.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

July 18, 1975.

James H. Wilkins, Jr., Rose, Nash, Williamson, Carroll & Clay, Little Rock, Ark., for petitioner.

Jack Lassiter, Asst. Atty. Gen., Little Rock, Ark., for respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EISELE, Chief Judge.

This habeas corpus proceeding pursuant to 28 U.S.C. § 2254 arose out of a state court conviction received by James G. Ellingburg in the Circuit Court of

Miller County in the early fall of 1972. Petitioner is presently in custody at the Cummins Unit of the Arkansas Department of Correction, serving a thirty-one and one-half year sentence as a result of that conviction.

On July 6, 1972, petitioner was charged by way of information with the crimes of burglary and grand larceny. The factual allegations which formed the basis of the information were that Ellingburg allegedly broke into an apartment occupied by his sister, stole her color television set, and on that same day pawned the television set with a local pawnbroker in his own name.

At the time of the theft Ellingburg was residing in a local motel under an assumed name. Until two days prior to the event, petitioner resided with his sister at her apartment at which time she asked him to leave because of his aberrant behavior. At the initial trial she testified that she asked her brother to leave because of his excessive drinking and his unwillingness to share in the living expenses.

On August 7, 1972, the trial court appointed Mr. David Potter of the Texarkana bar to represent Mr. Ellingburg. On August 27, 1972, Ellingburg was arraigned and entered a plea of not guilty to both charges. On September 11, 1972, seven days prior to trial, the State amended the original information, and in addition to the charges previously mentioned, Ellingburg was charged with a violation of Ark.Stat.Ann. § 43–2328 (Supl.1971) as an alleged habitual offender. The petitioner was never arraigned on the recidivist charge.

A jury trial was held on September 18, 1972, before the Honorable John Goodson, Circuit Judge of the Eighth Judicial Circuit of Arkansas. The jury returned a verdict of guilty on the grand larceny count, but acquitted petitioner on the burglary count. As is the practice in Arkansas, the jury assessed Ellingburg's punishment, setting his term of imprisonment at three years.

Immediately following the return of verdicts on the original counts, the trial judge informed the veniremen for the first time that they were to hear evidence on the recidivism charge. After retiring a second time, the jury found petitioner guilty of being an habitual criminal, the effect of which substituted a thirty-one and one-half year term of imprisonment in the place of the three-year term previously assessed.

Petitioner's conviction was upheld on direct appeal by the Arkansas Supreme Court. *Ellingburg v. State,* 254 Ark. 199, 492 S.W.2d 904 (1973). Alleging his mental incompetence at the time of trial, petitioner again appealed to the Arkansas Supreme Court requesting a post-conviction hearing in the trial court under Arkansas Rules of Criminal Procedure, Rule One. Permission was granted. Ark.Sup.Ct. Per Curiam Op., 73–11CR, April 30, 1973. On October 31, 1973, the Honorable John Goodson denied Ellingburg's post-conviction petition, finding petitioner to have been mentally competent at the time of his trial. Exhaustion of available state remedies has been conceded by the respondent.

On February 25, 1975, an evidentiary hearing was held in this Court. Petitioner appeared in person and through his court-appointed counsel, Mr. James Wilkins. Respondent, A. L. Lockhart, appeared through his attorney, Mr. Jack Lassiter, Assistant Attorney General for the State of Arkansas.

In his application for the writ of habeas corpus petitioner has raised a plethora of claims upon which he contends his conviction should be reversed. By choice of both parties, evidence at the hearing before this Court was limited to those matters bearing on the following issues: (1) whether petitioner was denied due process in contravention of the Fifth and Fourteenth Amendments to the United States Constitution by the trial judge's determination that petitioner was sane at the time he committed the offense and that he was mentally

competent to stand trial; (2) whether petitioner was denied constitutionally adequate notice of the State's intention to pursue the recidivism charge; and (3) whether petitioner received ineffective or inadequate representation by his court-appointed attorney at the initial trial.

There is little dispute as to the underlying legal principles that govern the disposition of this case. Application of these principles requires that the Court treat extensively only petitioner's first claim concerning the constitutional infirmity of the trial judge's determination of petitioner's sanity and mental competency. The conclusions reached herein render needless extended discussion of the remaining issues.

■■ No authority need be cited for the proposition that the state's conviction of an accused while he is legally incompetent violates due process. That states are required to provide procedures whereby a defendant's competency to stand trial may be determined was established in *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815. *See, e. g., Bumgarner v. Lockhart,* 361 F. Supp. 829, 833 (E.D.Ark.1973).

In Arkansas when the issue of an accused's competency to stand trial or his sanity at the time of the commission of the offense arises, Ark.Stat.Ann. §§ 43–1301–1309 (Supl.1974) sets forth the procedure whereby the Circuit Court may obtain psychiatric evidence pertaining to these issues. In 1972 Ark.Stat. Ann. § 43–1301 provided for postponement of the case and commitment of the accused forthwith to the Arkansas State Hospital for examination not exceeding one month when:

" . . . the defense of insanity at the time of the trial or at the time of the commission of the offense has been raised on behalf of the defendant and becomes an issue in the cause, or the circuit judge has reason to believe that the defense of insanity will be raised on behalf of the defendant and will become an issue in the cause, or shall be of the opinion that there are reasonable grounds to believe that the defendant was insane at the time of the commission of the offense with which he is charged or has become insane since the alleged commission of the offense . . . ."

When a request for a mental examination is made less than thirty days prior to trial, Ark.Stat.Ann. § 43–1304 provides that a circuit judge shall exercise his discretion in granting an order for an examination and shall not be required to enter an order unless "two reputable doctors of medicine appointed by the court" inform the court that there are reasonable grounds to believe the defendant insane.

In the instant case, petitioner, Ellingburg, filed two pro se motions with the Clerk of the Circuit Court of Miller County on August 1, 1972. One of these motions is entitled "Motion for Mental Examination". It sets forth numerous specific grounds upon which Ellingburg believed he was entitled to be adjudged an incompetent and requests that he be examined by at least two physicians qualified to determine his competency.[1]

---

1. The motion states:

"Comes on now James G. Ellingburg, pro se, without benefit of counsel, an indigent person, incarcerated in the Miller County Jail on a felony charge, and moves this Honorable Court for an order to issue, such order being petitioner be given a mental competency test by at least two (2) or more qualified doctors specialized in mental diseases, and that,

"1. Petitioner believes he is mentally incompetent, that,

"2. Petitioner suffers continuous severe headaches, that,

"3. In a time past, petitioner suffered a fractured skull, that,

"4. Petitioner hears voices talking to him when no person is near,

"5. Petitioner has been treated by both the U. S. Army and U. S. Air Force for mental disorder, and,

"6. While incarcerated in custody of the U. S. Attorney General, was on medication for mental disorder, and,

"7. Petitioner suffers temporary loss of memory at times, has blackouts, dizziness,

The second motion is entitled "Motion to Dismiss the Charge of Burglary" and alleges, *inter alia*, that the period during the commission of the offense "is a complete blank to petitioner", that "petitioner suffers from blackout spells, loss of memory for periods of days moving about . . . unknowing of his actions or sayings", and that petitioner "hears voices when there is no one around, hears his deceased mother calling to him, hears music when there is no music playing, suffers temporary insanity, [and] is abnormal in thinking and in mind". Both motions were filed more than thirty days prior to petitioner's September 18, 1972 trial date.

Mr. Potter first became aware of the pro se drafted motions when he visited Ellingburg in the jail shortly after Potter's appointment. Having practiced law in Texas and Arkansas for little more than two years, Potter felt it necessary to discuss the procedure for requested mental examinations with the trial judge. Through his conversations with the trial judge, Potter learned that it was the practice of the local court to require defendants to submit to an examination by a local physician before expending county money for the more costly examination at the Arkansas State Hospital.

At the arraignment on August 28, 1972, Mr. Potter raised the issue of the requested mental examination in the manner suggested by the trial court. Judge Goodson replied that Dr. Jerry Stringfellow, a local physician who was treating Ellingburg for tuberculosis during pre-trial detention, could examine petitioner and, if the doctor felt Ellingburg was in need of observation at the State Hospital, the issue could be presented when the situation arose.

Three days following the arraignment, Mr. Potter wrote to Dr. Stringfellow requesting that the examination be completed by September 11, the first day of the court's term on the criminal docket. It is clear that Mr. Potter assumed that Dr. Stringfellow was competent to conduct the examination from the fact of the trial court's appointment of the doctor pursuant to what Potter understood to be the local procedure. Mr. Potter failed to inquire into the doctor's qualifications. The only attempt Mr. Potter made to test the validity of the doctor's findings was to request that the examination be conducted by September 11, presumably to allow himself time to review the report.

On September 18, the morning of the trial, Mr. Potter had yet to receive a report on the examination. Prior to the opening of court, Potter entered Judge Goodson's chambers and informed the trial judge that the defense was unprepared for trial because the report had not been received. In response, Judge Goodson telephoned Dr. Stringfellow in Mr. Potter's presence and requested a report on the examination. The telephone conversation lasted but a few moments after which Judge Goodson related to Mr. Potter that Dr. Stringfellow had examined Mr. Ellingburg that morning and found him to be "sane". Mr. Potter accepted Judge Goodson's statements as a clear indication that the trial court was overruling the defense's motion for a mental examination at the State Hospital. The case was called for trial within minutes thereafter.

In retrospect Mr. Potter might well have been more zealous in challenging

---

fainting spells, etc., symptoms of mental disorder,

"8. That it is a well-established fact, men who are repeated offenders are mentally ill, and need medical attention rather than imprisonment for long periods of time, that,

"9. In January, 1972, petitioner had a malignant skin tumor removed from the left side of his face by surgery, since such op-

eration, petitioner's headaches have increased in severity, causing blackouts more often, loss of memory more often, and,

"10. Petitioner's mind is not in conjunction with his actions, that petitioner does not seem to understand right from wrong.

"Wherefore, all things considered, petitioner moves for the mental competency examination to determine his sanity."

the trial court's procedures in reaching its decision on the defendant's motion despite the risk of incurring judicial disfavor. Looking back it is also clear that defense counsel could have been more diligent by investigating Dr. Stringfellow's qualifications and prodding the doctor to conclude his examination within a reasonable time prior to trial. But when the court is actively directing the procedures, there are limits upon what should be expected of counsel. The Court notes and credits Mr. Potter's candid testimony depicting the brisk manner by which the trial court, in reliance on Dr. Stringfellow's statement that Mr. Ellingburg was "sane", in effect denied the defense request for a mental examination at the Arkansas State Hospital.

For the purposes of this opinion, this Court need not attempt to discriminate between the trial court's handling of the defense's motion with regard to the entirely separate and distinct issues of an accused's insanity at the time of the commission of the offense and an accused's mental incompetence at the time of trial.[2]

■■■ This Court's conclusion that petitioner's conviction should be set aside turns upon an effective showing by petitioner's able counsel before this Court that the state trial court arbitrarily denied petitioner's attempts to avail himself of the established state procedures whereby a mental examination at the Arkansas State Hospital could be obtained. However conscientious and praiseworthy might be the objective of the trial judge and trial counsel to guard against the unnecessary expenditure of county funds, such objective can never justify the denial of a defendant's right to a fair trial.

The postponement by the trial court in ruling on the defendant's motion until the telephone conversation with the doctor minutes before trial effectively prevented Mr. Potter from insisting on Mr. Ellingburg's right to a mental examination under the procedures established in Ark.Stat.Ann. §§ 43–1301–1309. To deny established procedures to a particular accused is a denial of due process, *Thomas v. Cunningham,* 313 F.2d 934, 937 (4th Cir. 1963), and a denial of a fair trial, *Pate v. Robinson, supra,* 383 U.S. at 385, 86 S.Ct. 836.

Moreover, it is clear from Dr. Stringfellow's candid testimony before this Court that his examination of Mr. Ellingburg was devoid of any significant findings upon which a determination of petitioner's sanity or competency could be based.

The mental examination itself consisted of nothing more than a short dialogue with petitioner at the jail on the morning of trial. The doctor conceded that his questions put to petitioner were not keyed to any recognizable testing procedure. The doctor merely discussed with Mr. Ellingburg petitioner's prior use of dilaudid in combination with alcoholic beverages. The conclusions reached by the doctor at the end of the conversation were that "Ellingburg was an intelligent man" and that "he seemed rational".

Dr. Stringfellow frankly testified that at the time of the examination he had no idea as to the significance of his report to the trial judge that petitioner was "sane". It was the doctor's own testimony that despite his qualifications in the field of general medicine, he lacked the professional skill to reach a valid conclusion that a man was either sane or competent for legal purposes. Indeed, the doctor testified that this was the first and last time that he has ever conducted an examination of this nature for these purposes.

In the instant case it is thus apparent that the dangers inherent in the short-shift procedures employed by the trial judge were realized, resulting in peti-

2. Confusion is apparent in the record with respect to these issues. It is not until the trial court's ruling on petitioner's post-conviction petition on October 31, 1973, retroactively finding Ellingburg competent to stand trial, that a distinction was clearly made.

tioner's deinal of the deliberate consideration of his allegations of incomptency and insanity by competent professionals as provided for in the Arkansas statutes.

That, on October 31, 1973, at the post-conviction hearing, the trial judge found petitioner mentally competent at the time of his initial trial has little effect on this Court's decision reversing petitioner's conviction. There is little difference between the sanity and competency determinations on the morning prior to trial and the decision reached at the post-conviction hearing.

The trial court order with regard to the post-conviction hearing states that petitioner refused to appear at the hearing because he feared for his life if he were to return to Miller County. In addition, the order states that petitioner refused the services of court-appointed counsel for the purposes of the hearing. In reaching his conclusion that petitioner was competent to stand trial, the trial judge refers only to a letter from Dr. Stringfellow received by the trial court two days following petitioner's trial. The letter merely incorporates the essence of the telephone conversation minutes prior to the initial trial, stating simply that the physician had examined petitioner on the morning of trial and found him to be sane. This Court sees no reason to treat this finding any differently than the determination reached on the morning of trial.

 Respondent's argument that petitioner's failure to pursue the issues of his competency and sanity before the jury amounted to a binding waiver of his claims merits short discussion. For obvious reasons a claim of incompetency is simply not a subject of waiver. *Pate v. Robinson, supra,* at 384, 86 S.Ct. 836. With regard to the insanity defense, there is no indication in the record of petitioner's knowing and intelligent waiver of same. Whether defense counsel committed a procedural mistake by not bringing up the matter before the jury could be the subject of a long discussion in this case. Nevertheless, a mistake as to procedure is not a waiver. *Bumgarner v. Lockhart,* 361 F.Supp. 829, 836 (D.C.1973).

 While it is unnecesssary for the disposition of this case that the Court treat petitioner's additional contentions, the Court notes for the record its conclusion that petitioner's claim that he was denied constitutionally adequate notice of the State's intention to pursue the recidivism charge has merit.[3] Independent of the resolution of this

3. Although petitioner and his court-appointed attorney knew that the prosecuting attorney had threatened to file an habitual criminal charge against Ellingburg, neither in fact knew, prior to the conclusion of the "first trial", that the information had actually been amended to include such additional charge. Mr. Potter testified before this Court that he was shocked and surprised when the court ordered the jurors back in the box and told the prosecutor to proceed on the habitual criminal charge. The effects were essentially twofold. Not knowing of the amended information, Mr. Potter did not prepare to meet the issues presented by the amendment of the information by doing the necessary legal research or by adequately investigating the factual basis of the State's contentions. Trial counsel and petitioner had no adequate opportunity to properly confer and plan during the "second trial". Testimony before this Court showed that information was available which could have been offered by petitioner in the "second trial" which could have resulted in the court's ruling certain prior convictions invalid for purposes of the habitual criminal statute or which, if credited by the jury, could have resulted in its disregarding prior convictions. Furthermore, the defense's tactics throughout the "first trial" might have been considerably different had the existence of the amended information been known to defendant and his attorney. In order to avoid the risk of the jurors' obtaining the impression that they had been deceived during the "first trial" concerning petitioner's criminal background, defendant and his counsel might have determined it better strategy to bring out all of such matters during the "first trial", knowing that if he were convicted such matters would be brought forth with possibly devastating results. Due process requires that a person be informed of the charge against him, and have the opportunity to enter a plea thereto, *before* the trial.

case on a different ground, *see supra,* the Court concludes that this inadequacy of notice would warrant setting aside the enhancement portion of petitioner's original three-year sentence, that is, by the addition thereto of twenty-eight and one-half years.

Two questions remain for consideration. What effect, if any, does a vacation of the larceny conviction have on petitioner's conviction as a habitual offender enhancing the term of imprisonment on the larceny count? Further, what relief should be afforded to petitioner?

An inspection of Ark.Stat.Ann. §§ 43–2328–2330.1, the state recidivism statutes, reveals that it is a condition precedent to consideration of prior offenses for the purpose of the habitual offender charge that one be convicted of what is referred to as a "current offense". It is for this reason that § 43–2328 is best referred to as a sentencing enhancement provision. In this instance, if the conviction on the "current offense", grand larceny, falls, then conviction as a habitual offender enhancing the sentence received on the larceny charge must fall with it.

With regard to the relief to be afforded to petitioner, this Court has previously indicated in this memorandum that petitioner's conviction should be vacated. The setting aside of the conviction is premised on the conclusion that the State could not effectively discharge its constitutional obligation to afford petitioner a fair trial by conducting a separate hearing at this late date on petitioner's pre-trial motions without granting him a new trial. Petitioner should have the opportunity to have all issues which may be determinative of his guilt tried by a state judge or state jury under appropriate state procedures in conformity with the requirements of the Fourteenth Amendment.

Therefore, petitioner's conviction will be vacated with leave to the State to try him again within a reasonable time.